## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT MAGHAKIAN | ) | CASE NO. 3:12-cv-02346-UN4 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | *Assigned to:* |
| | ) | District Judge James M. Munley |
| CABOT OIL & GAS CORPORATION, | ) | |
| FACTORY EQUIPMENT | ) | |
| EXCAVATING, and GASSEARCH | ) | **ORAL ARGUMENT REQUESTED** |
| DRILLING SERVICES | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS CABOT OIL & GAS CORPORATION AND GASSEARCH DRILLING SERVICES CORPORATIONS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

Table of Authorities..................................................................................iii

I.   Introduction ....................................................................................... 1

II.  Statement of Questions Involved ..................................................... 2

III. Standard of Review ........................................................................... 3

IV.  Argument........................................................................................... 4

    A.    Neither Cabot Nor GDS Had a Duty to Warn or Protect
            Plaintiff ..................................................................................... 4

            1.    Cabot is not liable under a theory of premises liability
                  because it relinquished control of the premises to H&P at
                  the time of the alleged injury...................................................... 5

            2.    GDS is not liable under a theory of premises liability
                  because GDS, an independent contractor, was hired to
                  perform one discrete task on a portion of the Blaisure site
                  and was not in control of the premises...................................... 9

    B.    Even if They Had a Duty Under a Theory of Premises Liability,
            Defendants Did Not Breach Any Duty Allegedly Owed to
            Plaintiff ................................................................................... 12

            1.    Defendants did not have actual or constructive notice of
                  the alleged dust cloud that allegedly injured Plaintiff............. 13

            2.    The alleged dumping and resulting dust cloud were
                  obvious .................................................................................... 17

            3.    Defendants discharged any possible duty by warning
                  H&P that dumping would be taking place at the well site...... 21

    C.    There Is No Evidence to Support Plaintiff's Allegation That the
            Particular Dust Cloud to Which He Was Exposed Was
            Comprised of Soil Cement or a Hazardous Material......................... 23

    D.    Defendants Cannot Be Held Liable for the Negligent Acts of
            Factory Equipment................................................................... 27

    E.    Plaintiff Failed to Present Admissible Evidence to Support a
            Finding of Medical Causation ................................................. 30

F.     Summary Judgment Should be Granted in Favor of Defendants
Because Plaintiff Admitted on March 27, 2012, More Than a
Year After the Alleged Exposure, That He Had Not Suffered
Any Injury or Illness Within the Prior Five Years ............................ 31

V.     Conclusion..................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
106 S. Ct. 2505 (1986) .................................................................... 3, 23

*Arce v. U-Pull-It Auto Parts, Inc.*,
No. 06-5593, 2008 WL 375159 (E.D. Pa. Feb. 11, 2008) ................................ 21

*Brletich v. U.S. Steel Corp.*,
285 A.2d 133 (Pa. 1971) .................................................................... 5, 6, 9

*Buzzerd v. Flagship Carwash of Port. St. Lucie, Inc.*,
669 F. Supp. 2d 514 (M.D. Pa. 2009) ...................................................... 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................... 3, 4, 23, 27

*Chenot v. A.P. Green Servs., Inc.*,
895 A.2d 55 (Pa. Super. Ct. 2006) ........................................................ 13

*Colloi v. Phila. Elec. Co.*,
481 A.2d 616 (Pa. Super. Ct. 1984) ....................................................... 17

*Craig v. Franklin Mills Assocs., L.P.*,
555 F. Supp. 2d 547 (E.D. Pa. 2008) .................................................. 14, 16

*Estate of Zimmerman v. Se. Penn. Transp. Auth.*,
168 F.3d 680 (3d Cir. 1999) ............................................................... 4, 5

*Estrada v. Wass*,
No: 3-10-CV-1560, 2012 WL 5879629 (M.D. Pa. Nov. 21,
2010) ............................................................................. 18, 19, 20, 21

*Farabaugh v. Pa. Turnpike Comm'n*,
911 A.2d 1264 (Pa. 2006) .......................................................... 5, 17, 21, 29

*Fisher v. United States*,
441 F.2d 1288 (3d Cir. 1971) ............................................................. 5, 6, 9

*Felix v. GMS, Zallie Holdings, Inc.,*
   827 F. Supp. 2d 430 (E.D. Pa. 2011) ............................................................... 14, 16

*Gales v. United States,*
   617 F. Supp. 42 (W.D. Pa. 1985) ..................................................................... 13, 15

*Gutteridge v. A.P. Green Servs., Inc.,*
   804 A.2d 643 (Pa. Super. Ct. 2002) ...................................................................... 13

*Hader v. Coplay Cement Mfg. Co.,*
   189 A.2d 271 (Pa. 1963) ........................................................................................ 27

*Heller v. Shaw Indus., Inc.,*
   167 F.3d 146 (3d Cir. 1999) ................................................................................... 24

*Hower v. Wal–Mart Stores, Inc.,*
   No. 08–1736, 2009 WL 1688474 (E.D. Pa. 2009) ......................................... 15, 16

*Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.,*
   898 F.2d 946 (3d Cir. 1990) ..................................................................................... 3

*Lal v. Target Corp.,*
   Civ. No. 12-5007, 2013 U.S. Dist. LEXIS 47380 (E.D. Pa.
   Apr. 2, 2013) ............................................................................... 15, 16, 30, 31

*Lonsdale v. Joseph Horne Co.,*
   587 A.2d 810 (Pa. Super. Ct. 1991) ...................................................................... 13

*McDonald v. Lowe's Companies, Inc.,*
   No. 08-CV-219, 2009 WL 3060413 (E.D. Pa. Sept. 24, 2009) .................... 18, 28

*Neve v. Insalaco's,*
   771 A.2d 786 (Pa. Super. Ct. 2001) ...................................................................... 14

*Palenscar v. Michael J. Bobb, Inc.,*
   266 A.2d 478 (Pa. 1970) ........................................................................................ 17

*In re Paoli R.R. Yard PCB Litig.,*
   2000 U.S. Dist. LEXIS 12993 ............................................................................... 30

*In re Paoli R. Yard PCB Litig.,*
   916 F.2d 829 (3d. Cir. 1990) ................................................................................. 24

*Pastore v. Bell Tel. Co. of Pa.*,
   24 F.3d 508 (3d Cir. 1994) ................................................................. 23

*Rudy v. A-Best Prods Co.*,
   870 A.2d 330 (Pa. Super. Ct. 2005) ............................. 9, 10, 13, 14, 29

*Smith v. German*,
   253 A.2d 107 (Pa. 1969) ...................................................................... 30

*Warnick v. The Home Depot U.S.A., Inc.*,
   516 F. Supp. 2d 459 (E.D. Pa. 2007) ..................... 5, 17, 18, 19, 21, 27, 28, 29

*Wombacher v. Greater Johnstown Sch. Dist.*,
   20 A.3d 1240 (Pa. Commw. Ct. 2011) ................................................. 5

## Rules and Statutes

Fed. R. Civ. P. 56(c) ............................................................................. 23

Fed. R. Civ. P. 56(c)(2) .......................................................................... 3

Local Rule 7.8 ........................................................................................ 15

Defendants Cabot Oil & Gas Corporation ("Cabot") and GasSearch Drilling Services Corporation ("GDS") (collectively "Defendants") submit this Brief in Support of their Motion for Summary Judgment.

## I. Introduction

Plaintiff Scott Maghakian ("Plaintiff") alleges he was injured on a natural gas well site (the "Blaisure site") leased by Cabot and on which GDS, Cabot's subsidiary, was performing a service as an independent contractor. Statement of Facts (hereinafter "SOF") ¶ 1. Specifically, Plaintiff alleges that *another* independent contractor at the Blaisure site, Factory Equipment Excavating ("Factory Equipment"), dumped "soil cement" in a reserve pit in a negligent manner that created a sudden, large dust cloud that, in a matter of seconds, allegedly covered Plaintiff and injured him. SOF ¶ 5. Plaintiff was present on the site as an independent contractor truck driver, hired by Landstar Corporation ("Landstar"), which was hired by Dalton Logistics, Inc. ("Dalton Logistics"), which in turn was hired by Helmerich & Payne International Drilling Company ("H&P") to move one of H&P's drilling rigs from the site. SOF ¶¶ 11, 17-18. Plaintiff asserts claims under theories of premises liability, alleging that Defendants breached a duty to protect him from, or warn him of, the dust cloud to which he was purportedly exposed.[1] SOF ¶ 6.

---

[1] While Defendants deny that any dust cloud occurred, for purposes of summary judgment only, Defendants do not contest the general allegation that Plaintiff was exposed to a "dust cloud" while on the Blaisure site, however, in connection with the exposure, Plaintiff has the burden to prove, among other things, the identity of the substance from which the dust cloud was comprised. In this case, although Defendants admit that soil cement was unloaded via dump trucks on the Blaisure site as part of the reserve pit abatement process on certain dates in November 2010, Plaintiff has no evidence and cannot prove that soil cement was dumped on the date he was allegedly injured and the only evidence that demonstrates when soil cement was being unloaded demonstrates that soil cement was not unloaded on the date Plaintiff alleges exposure.

This Court should grant summary judgment in favor of Defendants because: (1) Defendants did not have a duty to warn or protect Plaintiff under a theory of premises liability; (2) even if they had a duty, Defendants did not breach any such duty because: (i) they did not have actual or constructive notice of the dust cloud; (ii) the dump truck activity and possibility that dust clouds may occur was obvious; and (iii) H&P, the party ultimately responsible for bringing Plaintiff on the Blaisure site, was advised that the pit abatement process, which included dump trucks unloading soil cement into the reserve pit, would occur; (3) Plaintiff has no evidence to support his allegation that the particular dust cloud to which he was exposed was comprised of soil cement or a hazardous material; (4) Defendants are not liable for the negligent acts of Factory Equipment, an independent contractor; (5) Plaintiff failed to produce any admissible expert medical causation testimony; and (6) Plaintiff admitted, more than a year after the alleged exposure, that he had not suffered any illness or injury within the past five years, which included the time of the alleged exposure.

## II.     Statement of questions involved

**A.      Should summary judgment be granted in favor of Defendants because neither Cabot nor GDS had a duty to warn or protect Plaintiff under theories of premises liability?**

Suggested Answer:  Yes.

**B.      Should summary judgment be granted in favor of Defendants because even if they had a duty to warn or protect, Defendants did not breach that duty?**

Suggested Answer:  Yes.

**C.      Should summary judgment be granted in favor of Defendants because Plaintiff has no evidence to support his allegation that the particular dust cloud to which he was allegedly exposed was comprised of soil cement or a hazardous material?**

Suggested Answer: Yes

**D.** **Should summary judgment be granted in favor of Defendants because Defendants cannot be held liable for the negligent acts of Factory Equipment, an independent contractor?**

Suggested Answer: Yes

**E.** **Should summary judgment be granted in favor of Defendants because Plaintiff failed to present admissible expert medical causation testimony?**

Suggested Answer: Yes.

**F.** **Should summary judgment be granted in favor of Defendants because Plaintiff admitted on March 27, 2012, more than a year after the alleged exposure, that he had not suffered any injury or illness within the prior five years?**

Suggested Answer: Yes.

## III.      Standard of Review

An order granting summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A "genuine" dispute over a fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3d Cir. 1990).

Summary judgment may be granted, upon motion and after an adequate period for discovery, against a party who has failed to make a sufficient showing establishing the existence of an element essential to the party's case and as to which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).  The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion" and "identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324.

## IV.   Argument

Defendants are entitled to summary judgment for the following independent reasons because the evidence demonstrates as a matter of law that:  (A) neither Cabot nor GDS had a duty to warn or protect Plaintiff;  (B) even if Defendants had a duty, the evidence demonstrates that neither Cabot nor GDS breached any duty allegedly owed to Plaintiff;  (C) there is no evidence to support Plaintiff's allegation that the dust cloud to which he was allegedly exposed was comprised of soil cement or any hazardous substance;  (D) Defendants cannot be held vicariously liable for the negligent acts of their independent contractors;  (E) Plaintiff failed to present admissible expert medical causation evidence; and (F) Plaintiff admitted that he suffered no injury or illness during the time he alleges to have been injured.

### A.    Neither Cabot Nor GDS Had a Duty to Warn or Protect Plaintiff.

Pennsylvania law holds that a possessor of land—that is, someone that "occupies the land with the intent to control it"—owes certain duties to people who enter the possessed land. *Estate of Zimmerman v. Se. Penn. Transp. Auth.*, 168 F.3d 680, 684 (3d Cir. 1999) (applying Pennsylvania law).  But those who are not possessors, or those to which an exception applies, ***do not owe any special duties*** to others on a particular location beyond the ordinary duties owed to all individuals

in the public domain. *See id.* In this case, Defendants were not in possession of the Blaisure site and, therefore, owed no special duty to Plaintiff, because (1) Cabot had relinquished control of the Blaisure site to an independent contractor, H&P (and its subcontractors), at the time of the rig move in which the alleged injury occurred; and (2) GDS was hired to perform a discrete task and had no control over the Blaisure site. Accordingly, Plaintiff's premises liability claims fail as a matter of law.

      1.      **Cabot is not liable under a theory of premises liability because it relinquished control of the premises to H&P at the time of the alleged injury.**

When a possessor "turns the work over to an independent contractor with experience and know-how, who selects his own equipment and employees, the possessor of land has no further liability in connection with the work to be done." *Brletich v. U.S. Steel Corp.*, 285 A.2d 133, 136 (Pa. 1971) (internal quotations omitted); *Wombacher v. Greater Johnstown Sch. Dist.*, 20 A.3d 1240, 1244 (Pa. Commw. Ct. 2011) (same); *Warnick v. The Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 467 (E.D. Pa. 2007) ("The general rule is that a party that hires a general contractor is exempt from liability for injuries sustained by the contractor's employees."); *Farabaugh v. Pa. Turnpike Comm'n*, 911 A.2d 1264, 1275 (Pa. 2006) ("So long as the owner is out of control of the land, no duty is placed on the owner."). "An independent contractor is in possession of the necessary area occupied by the work contemplated under the contract and his responsibility replaces that of the owner who is, during the performance of the work by the contractor, out of possession and without control over the work or the premises." *Brletich*, 285 A.2d at 136.

In *Fisher v. United States*, a landowner hired a general contractor to oversee the construction of a dam, who in turn hired several subcontractors. 441 F.2d

1288, 1289 (3d Cir. 1971). An employee of one of the subcontractors was injured during the project and sued the landowner under a theory of premises liability. *Id.* But the Third Circuit held that the owner could not be held liable for the employee's injuries because the "prime independent contractor actually t[ook] over the site." *Id.* at 1291. The prime contractor had then hired "various subcontractors, and all the contractors collectively move[d] in large amount of material, equipment, and personnel." *Id.* In such an instance, where the land owner only exercised a right of supervision and inspection over its independent contractors, the court held it was "impossible to consider the [owner's] liability as that of a possessor of land." *Id.* at 1292. The landowner therefore could not be held liable under a theory of premises liability. *Id.*

Similarly, in *Brletich*, a property owner hired a demolition company as an independent contractor to demolish a trestle, which in turn hired another independent contractor to provide and operate a crane for the demolition. 285 A.2d at 133. An employee of the demolition company was injured by the alleged negligence of the crane operator. *Id.* The plaintiff could not show actual control of the premises by the owner because control of the site had been turned over to the demolition company at the time of the injury, but the plaintiff nevertheless contended that the owner's ability to take control at any time rendered the owner a possessor. *Id.* at 134-35. The Pennsylvania Supreme Court rejected this argument, holding that merely employing a person to inspect the work of an independent contractor or to "ascertain that the work is done according to plans and specifications" does not place the owner in control of the premises. *Id.* at 135. Thus, because the owner had "turn[ed] the work over to an independent contractor," the owner was not a possessor of the site for purposes of a premises liability claim. *Id.*

In this case, Cabot had relinquished control of the Blaisure site to H&P, which, in turn, had hired subcontractors (including Plaintiff), at the time Plaintiff claims he was injured. SOF ¶¶ 7, 8, 10-13, 15-18. In his Amended Complaint, Plaintiff alleged that he was injured "[o]n or about November 29, 2010," while he was at the Blaisure site "working as an independent contractor truck driver/hauler licensed to Landstar Corp. moving an oil drilling rig."[2] SOF ¶ 4. As the evidence shows, Plaintiff was at the Blaisure site to assist H&P with moving its drilling rig from the Blaisure site to another drilling location. SOF ¶¶ 11, 17-18. H&P was Cabot's independent drilling contractor, which conducted all drilling operations at the Blaisure site. SOF ¶ 7. Although Cabot would supervise drilling operations while they were ongoing, in this instance, drilling had concluded and the rig had been released by November 11, 2010, more than two weeks before the alleged incident. SOF ¶¶ 9, 16. After drilling ceased, as is standard practice in the industry, H&P personnel remained at the Blaisure site to safeguard H&P's rig and coordinate its eventual move to another drilling location, a practice that is referred to in the industry as "dry watch." SOF ¶ 10. Cabot was not involved in these post-drilling activities, and was not on location. SOF ¶¶ 10, 13, 16. According to industry custom and practice, the drilling contractor, in this case H&P, the party arranging the rig move, was responsible for taking safety precautions to protect those whom H&P or its contractor, Dalton Logistics, or subcontractor Landstar, brought onto the Blaisure site to move H&P's rig. SOF ¶ 15. These safety precautions included informing H&P's subcontractors, or any others hired to move

---

[2]     As will be demonstrated below, during his deposition, based on medical records showing his admission date, Plaintiff testified that the alleged exposure occurred on November 30, 2010 or December 1, 2010, but in no circumstances before November 30, 2010. SOF ¶ 73.

H&P's rig, of activities taking place on the Blaisure site, and any associated safety concerns. SOF ¶ 15.

H&P hired Dalton Logistics to conduct the rig move. SOF ¶ 11. Dalton Logistics in turn hired Plaintiff's employer, Landstar, to transport certain rig parts. SOF ¶¶ 17-18. Neither Cabot nor GDS hired Dalton Logistics. SOF ¶ 12. Dalton Logistics was not a party to any contract or other written or oral agreement with Cabot or GDS. SOF ¶ 12. Dalton did not receive any compensation from either Cabot or GDS. SOF ¶ 12. In fact, no Cabot employees were involved with the rig move or had any reason to be present on the Blaisure site during the move. SOF ¶ 13. H&P's personnel, H&P's contractors, and H&P's subcontractors, however, were present on the Blaisure site throughout the move, and H&P was aware that pit abatement was taking place at the same time. SOF ¶ 14.

Cabot was not present and had relinquished control of the Blaisure site to H&P and its subcontractors to accomplish the rig move. SOF ¶¶ 7, 8, 10-13, 15-16. H&P and its subcontractor Dalton Logistics were in charge of the activities on the Blaisure site at the time of the alleged injury. SOF ¶ 23. Consistent with the industry custom mentioned above, Richard Meredith ("Meredith"), the President of Dalton Logistics, testified that Dalton Logistics was "in charge of directing the activities of ... Landstar" and other independent contractors, including Plaintiff, on the Blaisure site with respect to the move. SOF ¶ 19. Plaintiff confirmed that Meredith and other Dalton Logistics employees were "in charge of the location and the moving of the [rig] parts." SOF ¶ 20. Plaintiff testified that Meredith was the "boss man" and the "big cheese," and, when he was on a location, "[w]hat he says goes." SOF ¶ 21. Plaintiff testified that he parked his truck near the area where

the dump trucks were unloading at the direction of a Dalton Logistics employee.[3]
SOF ¶ 22.

Under these facts, Cabot cannot be held liable under a theory of premises liability. Like the defendants in *Fisher* and *Brletich*, Cabot "turn[ed] the work over" to its independent contractor, H&P, with respect to removing and clearing the rig parts from the Blaisure site. *Brletich*, 285 A.2d at 133, 135. H&P, in turn, took over the Blaisure site, and hired a subcontractor (who hired a subcontractor) who moved in a large amount of equipment and personnel to conduct the move. *Fisher*, 441 F.2d at 1291-92. Under Pennsylvania law, in this factual situation, it is "impossible to consider [Cabot's] liability as that of a possessor of land." *Id.* Plaintiff's claims against Cabot under the theory of premises liability therefore fail as a matter of law.

> 2. **GDS is not liable under a theory of premises liability because GDS, an independent contractor, was hired to perform one discrete task on a portion of the Blaisure site and was not in control of the premises.**

As this Court previously stated, "[s]imply being present on the land (or even being an owner of the land) is insufficient to make one a 'possessor.'" Doc. 68 at 11 (citing *Rudy v. A-Best Prods Co.*, 870 A.2d 330, 333 n.4 (Pa. Super. Ct. 2005)). Instead, "for a party to be a 'possessor' of land, it must meet one of the following descriptions: it must be in occupation of the land with the intent to control it, it must have been in occupation of the land with intent to control it if no other party has done so subsequently, or it is entitled to immediate occupation if neither of the

---

[3]     For purposes of summary judgment only, Defendants do not contest that Plaintiff parked his truck within 35 feet of where Factory Equipment was unloading material, at the direction of Dalton Logistics, but will contest this fact at trial if necessary.

other alternatives apply." *Id.* Because GDS does not satisfy any of these alternatives, it cannot be considered a possessor of the Blaisure site.

GDS is a wholly owned subsidiary of Cabot based in Montrose, Pennsylvania. SOF ¶ 25. Although GDS is a wholly owned subsidiary of Cabot, it is a distinct corporate entity. SOF ¶ 26. GDS maintains separate offices from Cabot. SOF ¶ 26.

In contrast to Cabot, GDS does not lease land or operate oil and gas wells. SOF ¶ 29. GDS is not an exploration and production company and, therefore, GDS does not operate or control well sites or areas of land, nor does GDS perform general open-ended tasks around a well site. SOF ¶¶ 27-30. Instead, GDS is a services company that is hired by oil and gas lessees and operators to perform specific services on a given site, including water services, roustabout services, and in 2010, pit abatement services. SOF ¶ 28. Thus, when GDS is on a location, it is present as an independent contractor at the request of an operator or lessee such as Cabot, and GDS is not in control of the premises. SOF ¶ 30. In connection with the services GDS provides, on occasion, GDS hires independent contractors like Factory Equipment to perform certain tasks necessary to complete its overall work on a well site. SOF ¶¶ 36-37. GDS's independent contractors are responsible for their own equipment and employees. SOF ¶ 35.

In his Amended Complaint, Plaintiff alleges that GDS was on the Blaisure site "cleaning up" the location. Doc. 42, ¶ 12. At the time H&P and its subcontractors were in control of the Blaisure site and moving rig parts, GDS was not conducting a clean-up operation of the Blaisure site.[4] Instead, GDS was on the

---

[4]     On November 30, 2010, GDS provided the services of two GDS employees, from 6:00 a.m. to 12:00 p.m., to clean up plastic and felt from the Blaisure tank farm area, which is distinct from and not part of the Blaisure well pad where the alleged exposure occurred. These services were not related to H&P's rig move, did not involve Factory Equipment, and these employees were not in control of the

Blaisure site conducting services related to solidifying drill cuttings on a small area of the Blaisure location measuring approximately 40 feet by 50 feet. SOF ¶¶ 31, 41. At the time of the alleged incident, the Blaisure site was approximately 188,000 square feet, (SOF ¶ 41) and all but the small portion on which GDS was working, was utilized by H&P to move its rig parts from the site. GDS, therefore, did not exercise control over the Blaisure site, but instead entered upon a portion of the site to perform discrete tasks related to the pit abatement process. SOF ¶¶ 31, 41. GDS did not assist with and had no role whatsoever in connection with H&P's rig move. SOF ¶ 33. GDS did not assist with the rig move or direct Landstar's trucks where to park or load the rig parts, as Dalton Logistics did, but instead simply worked on the job it was hired to do. SOF ¶¶ 22, 33. And with respect to the actual conduct that allegedly injured Plaintiff, the alleged dumping of soil cement, GDS had turned over that work to its independent contractor, Factory Equipment. SOF ¶¶ 38-40.

Under these facts and Pennsylvania law, GDS cannot be considered a possessor of the Blaisure site. GDS did not occupy the site with an intent to control it, but instead entered onto the Blaisure site as an independent subcontractor, hired to perform a single discrete job on a specific small area of the

_____

Blaisure site. SOF ¶ 83. Additionally, on that same date, GDS provided the services of four GDS employees, two from 1:00 p.m. to 3:00 p.m., and two from 10:00 a.m. to 3:00 p.m., to manually remove debris from the well cellars and discard it into a dumpster on the Blaisure site. These services were not related to H&P's rig move, did not involve Factory Equipment, and these employees were not in control of the Blaisure site. SOF ¶ 84.

Blaisure site. SOF ¶¶ 31, 41. Therefore, as a matter of law, neither Cabot nor GDS is liable under a premises liability theory.[5]

**B.      Even if They Had a Duty Under a Theory of Premises Liability, Defendants Did Not Breach Any Duty Allegedly Owed to Plaintiff.**

Even if, *arguendo*, Defendants could be held liable under a premises liability theory, which they cannot, Defendants, as a matter of law, did not breach a duty to warn or protect Plaintiff. First, there is no evidence that Defendants had actual or constructive notice of the alleged dust cloud that allegedly injured Plaintiff. By Plaintiff's own telling, the alleged dust cloud appeared suddenly as the result of a negligent act by Factory Equipment and dissipated quickly. SOF ¶¶ 5, 55. Because Pennsylvania law does not impose liability on a possessor of land without a showing that the possessor had actual or constructive notice of the purported dangerous condition—and thus, had an opportunity to do something about it— Plaintiff cannot recover on his claims against Defendants *even if* he could show (which he cannot) that they owed him a duty under a premises theory of liability.

Second, Plaintiff's claims against Defendants fail because the dangerous condition of which he complains—a "very large cloud of dust"—and the conduct that supposedly created it—the negligent dumping of a dusty substance—would have been equally obvious to Plaintiff as to Defendants. Thus, under the law, Defendants did not have, and therefore could not have breached, a duty to warn or protect Plaintiff.

---

[5]      Holding GDS liable pursuant to a theory of premises liability under these circumstances would lead to the illogical result that every independent contractor on the Blaisure site, including the Plaintiff, would be liable to others under a theory of premises liability. In other words, every independent contractor would have had a duty to warn and protect others from alleged dangerous conditions on the Blaisure site.

Third, Defendants discharged any such possible duty by advising H&P that the pit abatement process, including the alleged dumping of soil cement, would be taking place on the site. SOF ¶¶ 44-46. Under the law, Defendants did not have to advise each subcontractor of H&P separately as well. The fact that H&P may not have passed along that information (or may have and Plaintiff chose to ignore it) does not mean that Defendants can be held liable for the alleged injuries.

1. **Defendants did not have actual or constructive notice of the alleged dust cloud that allegedly injured Plaintiff.**

"Under Pennsylvania law, the possessor of land is not the insurer of the safety of those on the premises, and the mere existence of a harmful condition or the mere happening of an accident is not evidence of a breach of duty of care to invitees."[6] *Gales v. United States*, 617 F. Supp. 42, 43 (W.D. Pa. 1985); *Lonsdale v. Joseph Horne Co.*, 587 A.2d 810, 813 (Pa. Super. Ct. 1991) ("A possessor of land is not an insurer of his business invitees."). Instead, a plaintiff must prove that the possessor knew, or in the exercise of reasonable care should have known, of the existence of the condition that caused the harm.[7] *Lonsdale*, 587 A.2d at 813; *Rudy*, 870 A.2d at 333 ("A possessor of land is subject to liability for physical harm caused to invitees by a condition on the land if, but only if, he knows or by the exercise of reasonable care would discover the condition …."); *Chenot v. A.P. Green Servs., Inc.*, 895 A.2d 55, 63 (Pa. Super. Ct. 2006). Plaintiff has not carried his burden here.

---

[6] Defendants dispute that Plaintiff was an invitee. But the Court need not reach this issue here, because, even if Plaintiff were an invitee, Plaintiff's claim would still fail for the reasons stated herein.

[7] Plaintiff fully concedes this point, arguing that a possessor of land owes a duty to warn of a dangerous condition that is "known or discoverable to the owner." *See* Doc. 53, at 9 (citing *Gutteridge v. A.P. Green Servs., Inc.*, 804 A.2d 643 (Pa. Super. Ct. 2002)).

First, Plaintiff does not allege, nor is there any evidence to support, that Cabot or GDS had *actual* notice of the alleged dust cloud that purportedly caused Plaintiff's injury. In fact, no employee of Cabot even had reason to be present on the Blaisure site on the date of Plaintiff's alleged injury. SOF ¶ 13. In addition, representatives from both GDS and Dalton Logistics have testified that they never saw a dust could on the Blaisure site, nor did anyone mention such an occurrence to them. SOF ¶¶ 50, 67. Bruce Cokely ("Cokely"), the GDS employee conducting the pit abatement process on the Blaisure site, testified that he observed the dumping by Factory Equipment throughout the process and never witnessed any dust clouds. SOF ¶¶ 48-50. Thus, there simply is no evidence that Defendants had actual notice of the alleged dust cloud of which Plaintiff complains.

Second, Defendants had no constructive notice of the alleged dust cloud. To prove *constructive* notice, Plaintiff must show that Defendants should have, by the exercise of reasonable care, discovered the dangerous condition. *Rudy*, 870 A.2d at 333. "One of the most important factors to be taken into consideration" in determining whether a defendant has constructive notice of a dangerous condition "is the time elapsing between the origin of the defect or hazardous condition and the accident." *Neve v. Insalaco's*, 771 A.2d 786, 791 (Pa. Super. Ct. 2001). "The duration of the hazard is important because if a hazard only existed for a very short period of time before causing any injury, then the possessor of the land, even 'by the exercise of reasonable care,' would not discover the hazard, and thus would owe no duty to protect invitees from such a hazard.'" *Felix v. GMS, Zallie Holdings, Inc.*, 827 F. Supp. 2d 430, 437 (E.D. Pa. 2011) (holding there was no evidence of constructive notice of a spill in a store that caused plaintiff's injuries where there was "no evidence that any employee saw the spill, knew the spill was there, or that the spill lasted for any duration"); *Craig v. Franklin Mills Assocs.*, L.P., 555 F. Supp. 2d 547, 550-52 (E.D. Pa. 2008) (granting summary judgment

for mall owner on the grounds that the slip-and-fall plaintiff failed to prove the owner had constructive notice of spill in central area of mall because there was no evidence of duration of time that spill existed; "[u]nder such circumstances, the jury cannot be permitted to render a verdict based on 'conjecture, guess or suspicion,' and the determination must be made by the Court").

Similarly, if a possessor has no opportunity to remedy a dangerous condition before the plaintiff is injured, he cannot be deemed to have had constructive notice of the condition. *Lal v. Target Corp.*, Civ. No. 12-5007, 2013 U.S. Dist. LEXIS 47380, at *8 (E.D. Pa. Apr. 2, 2013) ("To prove constructive notice, Plaintiff must show, *inter alia*, that [the defendant] had an opportunity to remedy the dangerous condition.");[8] *Hower v. Wal–Mart Stores, Inc.*, No. 08–1736, 2009 WL 1688474, at *6 (E.D. Pa. 2009) ("Defendant cannot be liable for negligence by failing to identify and clean up a spill only a short time after its occurrence."). Thus, the alleged dangerous condition must have existed for such a length of time that in the existence of reasonable care it should have been discovered in time for the possessor to remedy the danger. *Gales*, 617 F. Supp. at 44.

Here, Plaintiff alleges that the alleged dust cloud that caused his injuries arose suddenly, as the result of the "negligent" manner in which Factory Equipment dumped a load of soil cement at the Blaisure site mid-morning on the day in question. SOF ¶ 5. At a deposition in a related case, Plaintiff testified that the alleged dust cloud created by Factory Equipment's negligence lasted only 2.8 seconds. SOF ¶ 58. At his deposition in this case, Plaintiff testified that the cloud appeared suddenly and lasted only a short period of time. SOF ¶¶ 55, 58. He

---

[8]     Pursuant to Local Rule 7.8, copies of unpublished opinions are attached hereto.

described his encounter with the dust cloud as occurring quickly and suddenly: "I turned around, and it was just woosh"—and then it was over. SOF ¶ 55.

The only other witness to the dust cloud, Paul Black ("Black") (Plaintiff's friend and fellow truck driver), also indicated that the incident occurred suddenly and lasted only momentarily. SOF ¶¶ 56-57. Black testified that, while standing with Plaintiff at the Blaisure site, he heard the Factory Equipment dump truck "rev" its motor to raise the bed with the material, and then observed the material "come whooshing out," which presumably caused the alleged dust cloud. SOF ¶ 56. Black indicated that he turned away from the dust cloud, which was then taken by the wind. SOF ¶ 57.

Based on the above,[9] Defendants could not have discovered the alleged dust cloud that Plaintiff alleges caused his injuries in time to warn him of it or do something to remedy the condition. The alleged dust cloud was, as Plaintiff claims, caused by the sudden negligent act of Factory Equipment, and the entire incident took place in a matter of seconds. SOF ¶¶ 5, 58. There was simply not enough time for Defendants to have discovered that the alleged dust cloud existed or to have remedied the allegedly dangerous condition. Accordingly, Defendants cannot be deemed to have had constructive notice of the dust cloud, if it existed at all. *Felix*, 827 F. Supp. 2d at 437; *Craig*, 555 F. Supp. 2d at 550-52; *Lal*, 2013 U.S. Dist. LEXIS 47380, at *8; *Hower*, 2009 WL 1688474, at *6.

It is undisputed that Defendants did not have either actual or constructive notice of the alleged dust cloud so as to warn Plaintiff of it or to remedy the

---

[9] Defendants dispute that a dust cloud ever occurred, and indeed Cokely testified that he observed Factory Equipment's activity at the Blaisure site and never observed a dust cloud of the type Plaintiff alleges. SOF ¶¶ 48-50. Nevertheless assuming *arguendo* that a dust cloud did occur, the only evidence of record establishes that it arose suddenly and rapidly dissipated.

condition. Thus, even assuming Defendants owed a duty to warn Plaintiff, Defendants cannot be held liable for failure to warn of such a sudden occurrence and, as such, are entitled to judgment as a matter of Pennsylvania law on this ground alone.

        2.       **The alleged dumping and resulting dust cloud were obvious.**

Whether a possessor of land owes an independent contractor a duty to warn of dangerous conditions on the premises "turn[s] on whether the owner ... [is] in a superior position to appreciate the risk posed to the contractor or his employees by the dangerous conditions." *Colloi v. Phila. Elec. Co.*, 481 A.2d 616, 620 (Pa. Super. Ct. 1984). A possessor will not be held responsible for injuries to independent contractors caused by dangerous conditions that are equally as obvious to the contractor as to the possessor. *Farabaugh*, 911 A.2d at 1273-75; *see also Palenscar v. Michael J. Bobb, Inc.*, 266 A.2d 478, 480 (Pa. 1970) ("[T]he law of Pennsylvania does not impose liability if it is reasonable for the possessor to believe that the dangerous condition would be obvious to and discovered by his invitee."). If the condition is obvious and the possessor does not have superior knowledge, then there is no duty to warn. *Fabraugh*, 911 A.2d at 1274-75 ("An owner of land who delivers temporary possession of a portion of the land to an independent contractor owes no duty of care to the employees of the independent contractor with respect to an obviously dangerous condition on that portion of the land in the possession of the contractor.").

In one case, the Eastern District of Pennsylvania held that a dangerous condition was "obvious" when multiple employees of an independent contractor had seen the dangerous condition and its danger should have been clear to those that had seen it. *Warnick*, 516 F. Supp. 2d at 466-67. There, Home Depot contracted with IBM to install wiring and networking products in its stores, and IBM subcontracted with a company named Datatec to do some of the installation

work. *Id.* at 464. An employee of Datatec fell through a wooden plank in Home Depot's ceiling and was injured. *Id.* But because (1) several other employees and the plaintiff himself all testified to having seen the board before the accident and (2) "an unsecured board resting high above the ground is obvious," Home Depot was held to have "no duty to warn [plaintiff] of the board's dangerousness." *Id.* at 466-67; *see also McDonald v. Lowe's Companies, Inc.*, No. 08-CV-219, 2009 WL 3060413, *6 (E.D. Pa. Sept. 24, 2009) (dangers of lifting a heavy metal grate to rearrange shelving at a Lowe's store were just as obvious to the contractor that lifted the grate as they were to Lowe's).

In another case, this Court held that the danger of a moving tractor trailer was just as obvious to a business invitee in the parking lot of a truck stop as it was to the truck stop, and that the truck stop therefore had no duty to warn its invitee of the dangers of being hit by the truck. *Estrada v. Wass*, No: 3-10-CV-1560, 2012 WL 5879629, *4-5 (M.D. Pa. Nov. 21, 2010). There, the Court held that a danger is "'obvious' when 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment." *Id.* at *4. Because the injured invitee had frequented truck stops and was or should have been aware of the danger of moving vehicles in their parking lots, the dangers were just as obvious to a person such as him exercising normal perception, intelligence and judgment as they were to the truck stop itself. *Id.* at *4-5. Accordingly, the truck stop had no duty to warn of the dangers of moving vehicles and had not breached any duties owed to the injured invitee. *Id.*

Here, Factory Equipment's dumping of a dusty substance into the reserve pit at the Blaisure site was obvious, and any dangers Plaintiff claims are associated with this activity—such as momentary dust clouds that one would not want to breathe *regardless* of the substance—would have been obvious as well. Black was

standing with Plaintiff only about 35 to 40 feet away from where the dump trucks were unloading material. SOF ¶ 61. Several dump trucks were involved in the activity which took place over a period of time. SOF ¶ 62. Specifically, Black observed three tri-axel dump trucks, and each truck made at least three or four trips. SOF ¶ 62. It had been raining, and as a result, the truck beds had to be elevated to a certain degree before the material would break loose and unload. SOF ¶ 63. From such a vantage point of 35 feet, the dumping process, and any resulting dust cloud, were as obvious as a defective wooden plank in a ceiling or a moving truck in a parking lot, and Defendants, therefore, had no legal duty to warn the Plaintiff of the dangers of standing 35 feet away from where multiple tri-axel dump trucks are unloading a dirt-like material. *See Warnick*, 516 F. Supp. 2d at 466-67; *Estrada*, 2012 WL 5879629 at *4-5. That Black took steps to avoid the alleged dust cloud (and did so successfully) illustrates that any danger posed by the dumping was obvious even without a warning. SOF ¶¶ 56-57. Black testified that he covered his face, turned away from the dust cloud as it passed, and thereafter had no negative symptoms. SOF ¶ 57.

Despite the fact that he completed safety training in which he was taught the importance of paying attention to his surroundings and to "be aware" of the activities taking place around him, (SOF ¶ 60) Plaintiff claimed he was unaware that multiple tri-axel dump trucks were dumping powdered material throughout the morning within 30 feet of where he was standing, because he was in his "safe haven" and was not paying attention:

    Q.    Okay.  So then you heard someone yell, "Look out"?
    A.    "Cover up."
    Q.    Okay, but prior to that, you did not see any dump trucks on the
          location?
    A.    **I wasn't paying attention.**
    Q.    Isn't one of the main things that – when you're going onto an
          industrial site, isn't it important and one of the main things they

teach you in safety is      to – and I want to use your words – be aware?

A.     **Of what I'm doing.**

Q.     Not be aware of what anyone else is doing?

A.     **I'm in my safe haven.  I'm by my truck.**

Q.     You're 30 feet away from where they're doing active work –

A.     That's their safe haven.  **That's their responsibility.**

SOF ¶ 59 (Ex. D, p. 129).  Plaintiff stated several other times during his deposition that he was not paying attention to anything else taking place around him on the Blaisure site.

- [W]hen we first got there, we're not paying attention to what they're all doing.  We're not – it's like – what they were doing, I don't know … They – I mean, there was – you know, it like, out of sight, out of mind.  SOF ¶ 59 (Ex. D, p. 118).

- I wasn't paying attention to what the dump truck was doing because I was in my safe zone, you know.  SOF ¶ 59 (Ex. D, p. 172).

And despite the fact that Black testified he had observed the dump trucks unloading throughout the morning, Plaintiff claims not to have seen them because he chose not to pay attention:

Q.     So during the entire morning, you didn't – did not notice any type of dump truck coming up or any type of dumping?

A.     We weren't – we weren't really paying – I wasn't paying attention.

SOF ¶ 59 (Ex. D, p. 125).

Plaintiff's negligence, evidenced by his decision to bury his head in the sand with respect to any activity taking place around him, does not entitle him to hold Defendants liable for not warning him of alleged dangers that are obvious to a reasonable man.  As was illustrated by this Court in *Estrada*, whether a danger is obvious is judged from the point of view of a "reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment."  2012 WL

5879629 at *4; *see also Arce v. U-Pull-It Auto Parts, Inc.*, No. 06-5593, 2008 WL 375159, *10 (E.D. Pa. Feb. 11, 2008) (noting that the inquiry into whether a condition was obvious is "an objective one, looking from the perspective of a reasonable person"). Regardless of whether Plaintiff was paying attention, the dumping and any associated dangers were open and obvious to any "reasonable person exercising normal perception, intelligence, and judgment," such as Black, and for this reason, Defendants had no duty to warn Plaintiff. *Estrada*, 2012 WL 5879629 at *4; *Warnick*, 516 F. Supp. 2d at 466-67; *Farabaugh*, 911 A.2d at 1273-75. Plaintiff's claims, therefore, fail as a matter of law.

### 3. Defendants discharged any possible duty by warning H&P that dumping would be taking place at the well site.

A "possessor of the land can insulate himself from liability by warning [a] contractor of the existence of any dangerous conditions on the premises which he knows or should know, ***and need not warn the contractor's employees***." *Farabaugh*, 911 A.2d at 1273 (emphasis added). When a possessor of land hires an independent contractor, the possessor discharges its duty to warn by warning that independent contractor of certain dangers, and there is no longer an obligation to warn subcontractors or employees further down the line. *See id.*

Here, Defendants discharged any possible duty by advising H&P that pit abatement would be taking place on the Blaisure site at the time of the rig move. Plaintiff was on the Blaisure site as an independent contractor of Landstar, which was a subcontractor of Dalton Logistics, which was a subcontractor of H&P. SOF ¶¶ 11, 17-18. Plaintiff was therefore on the Blaisure site as a subcontractor of H&P, and any duty owed to Plaintiff to warn that soil cement would be dumped on the Blaisure location would have been discharged by warning H&P. *See Farabaugh*, 911 A.2d at 1273. The H&P employee that was responsible for H&P's activities on the Blaisure site was advised of and knew that pit abatement,

including the use of dump trucks to unload soil cement into the reserve pit, would be occurring at the time of the rig move. SOF ¶¶ 44-46. As evidence of H&P's knowledge, H&P requested that an independent contractor hired to oversee completions activities taking place on November 21, 2010 (wholly unrelated to the rig move) use a crane to assist H&P with moving a piece of H&P's rig equipment off of the edge of the reserve pit to allow Factory Equipment's dump trucks access to dump the soil cement. SOF ¶ 47. It is widely-known and common practice throughout the industry that soil cement is used as part of the pit abatement process. SOF ¶ 43. Moreover, H&P was fully aware of the precise nature of the pit abatement process, and that the process involved the use of dump trucks to unload soil cement into the reserve pit because, H&P witnessed Factory Equipment unloading soil cement throughout October and November 2010. SOF ¶¶ 44-45. H&P had been warned dump trucks would be unloading soil cement into the reserve pit, at the time of the rig move, during which Plaintiff was allegedly injured.[10] Accordingly, even if Defendants had a duty to warn Plaintiff that dump trucks would be unloading soil cement on the Blaisure site, they discharged that duty by warning H&P.

---

[10]  Consistent with Pennsylvania law, according to industry custom and practice, the drilling contractor, in this case H&P, the party arranging the rig move, was responsible for taking safety precautions to protect those whom H&P or its contractor, Dalton Logistics, or subcontractor Landstar, brought onto the Blaisure site to move H&P's rig. SOF ¶ 15. These safety precautions included informing H&P's subcontractors, or any others hired to move H&P's rig, of activities taking place on the Blaisure site, and any associated safety concerns SOF ¶ 15.

## C. There Is No Evidence to Support Plaintiff's Allegation That the Particular Dust Cloud to Which He Was Exposed Was Comprised of Soil Cement or a Hazardous Material.

This Court should grant Defendants' Motion because there is no evidence to support Plaintiff's claim that the particular dust cloud to which he was exposed was comprised of soil cement, fly ash, or another hazardous material, which is an essential element to his claim. Because Defendants will not bear the burden of proof at trial on this point, they are able to meet their burden on summary judgment by showing that the evidence on record is insufficient to establish all necessary elements of the Plaintiff's claims. *Celotex*, 477 U.S. at 322-23. Once Defendants demonstrate an absence of evidence, the burden shifts to Plaintiff to demonstrate specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250. Plaintiff must "make a showing sufficient to establish the existence of every element essential to [his] case" and may not rely upon bare assertions or conclusory allegations. *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511 (3d Cir. 1994) (emphasis added). If Plaintiff fails to make such a showing, the Court is required to grant Defendants' Motion. *Celotex*, 477 U.S. at 322.

In order for Plaintiff to sustain his claim that he was injured from a dust cloud of soil cement or a dust cloud of a hazardous substance, as alleged in his Amended Complaint (Doc. 42, ¶ 1),[11] it logically follows that he must establish, among other things, that the dust cloud to which he was exposed was comprised of

---

[11]    In his Amended Complaint, Plaintiff alleges that he was injured by a cloud of "soil cement or some type of hazardous substance." Doc. 42, ¶ 1. Although Defendants admit that dump trucks unloaded soil cement at the Blaisure site on certain days in November, Plaintiff has no evidence that soil cement was unloaded on the day Plaintiff claims he was injured.

soil cement or a hazardous substance.[12] *See In re Paoli R. Yard PCB Litig.,* 916
F.2d 829, 860 (3d. Cir. 1990) (in order to make a prima facie case, among other
things, the plaintiff must demonstrate that the defendants released polychlorinated
biphenyls into the environment); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d
Cir. 1999) (in order to make a *prima facie* case, among other things, the Plaintiff
must demonstrate that the defendant's carpet emitted volatile organic compounds
into the air); *Buzzerd v. Flagship Carwash of Port. St. Lucie, Inc.,* 669 F. Supp. 2d
514, 519-20 (M.D. Pa. 2009) (in order to make a *prima facie* case, among other
things, the Plaintiff must demonstrate that carbon monoxide entered the truck's
passenger compartment).  Plaintiff has failed to set forth any evidence sufficient to
demonstrate that he was exposed to a dust cloud comprised of soil cement, fly ash,
or a hazardous substance.

Plaintiff has the burden to establish the composition of the dust cloud to
which he was exposed.  In his Amended Complaint, Plaintiff alleged that the
exposure occurred on or about November 29, 2010.  Doc. 42, ¶ 1.  However,
during his deposition, by using hospital records that identified the date of his
admission as December 2, 2010, Plaintiff was able to calculate backward from his

---

[12]    Plaintiff retained a medical causation expert, Ernest Chiodo, to opine as to
the causal relationship between the exposure and Plaintiff's alleged injuries.
Despite having no evidence as to the nature of the material to which Plaintiff was
exposed, Chiodo prepared an initial report speculating that Plaintiff was injured by
a dust cloud of fly ash.  SOF ¶ 91.  Chiodo later prepared an addendum stating that
Plaintiff's injuries were caused by an exposure to soil cement dust cloud.  SOF ¶
93.  Because Plaintiff's medical expert testimony is limited to fly ash and soil
cement, to the extent Plaintiff would attempt to prove some other substance caused
his injuries, he has no medical causation testimony to support such a claim.

admission date to definitively state that the exposure occurred on either November 30, 2010, or December 1, 2010. SOF ¶¶ 70-73.[13]

Although Plaintiff alleges that the dust cloud emanated from soil cement or some hazardous material that was allegedly dumped on location, Plaintiff has no evidence that soil cement, or a hazardous substance, was dumped on the location on either November 30, 2010 or December 1, 2010. During his deposition, Plaintiff testified that he had no idea what materials comprised the dust cloud. SOF ¶ 52. The only other witness to observe the purported dust cloud was Black. Black testified that he was told by someone that the material was fly ash, but he could not identify the individual who told him that and could not identify the material of which the dust cloud was comprised. SOF ¶ 53.[14]

Plaintiff appears to base his allegation that he was exposed to a dust cloud of soil cement on the fact that GDS produced a Construction/Roustabout Services Work Order ("Work Order") that demonstrates that Factory Equipment delivered 140 tons of "soil cement" to the location on November 29, 2010.[15] SOF ¶ 78. The

---

[13]     Plaintiff was first admitted to Endless Mountain Health Systems on December 2, 2010. SOF ¶ 70. Black testified that he took Plaintiff to the hospital the day following the exposure. SOF ¶ 72. Thus, based on Black's testimony, the exposure occurred on December 1, 2010. Plaintiff testified that he did not go to the hospital the day after the exposure, but instead went to the hospital on the second day after the exposure. SOF ¶¶ 70-71. Based on Plaintiff's testimony, the exposure occurred on November 30, 2010. During his deposition, Plaintiff agreed that the exposure occurred on either November 30, 2010 or December 1, 2010. SOF ¶¶ 70-73.

[14]     Even if Black could identify the person who told him the material was fly ash, Black's testimony is inadmissible to hearsay.

[15]     In November 2010 it was and currently is GDS' custom and practice to utilize construction/roustabout work orders to track the work performed by GDS. SOF ¶ 74. The work orders also are used to generate invoices to customers, such as Cabot. SOF ¶ 75. As a result, the work orders must accurately reflect and describe the work performed and the date the work was performed. SOF ¶ 76. In

Work Order was prepared by Cokely, the GDS employee conducting part of the pit abatement process on Cabot's well locations in 2010. SOF ¶ 79. The Work Order demonstrates that on November 29, 2010, Cokely was present on the Blaisure site from 6:00 a.m. until 7:00 p.m., performing pit abatement work. SOF ¶ 80. To complete the work, Factory Equipment delivered 140 tons of soil cement and 100 fifty-pound bags of calcium. SOF ¶ 81. GDS conducted a search of its files and located additional work orders that evidences that soil cement was delivered to the Blaisure location on November 26 and 27, as well. SOF ¶ 82. No work orders exist that evidence that soil cement, or fly ash, or a hazardous material was delivered to the Blaisure site on November 30, 2010 or December 1, 2010. SOF ¶ 85.[16] Based on GDS' custom and practices, the absence of a work order dated November 30, 2010, establishes that no soil cement, fly ash, or hazardous substance was dumped on the Blaisure location on November 30, or December 1, 2010, the only dates upon which the exposure could have occurred, based on Plaintiff's sworn testimony. SOF ¶¶ 88-89. Accordingly, Plaintiff failed to establish the existence of an element of his claim, *i.e.*, that the dust cloud to which

---

November 2010 it was and currently is GDS' custom and practice that the GDS employee in charge of the work performed complete a work order that identifies, among other things, the: (i) type of work performed; (ii) individuals who performed the work; (iii) length of time it took to complete the work; (iv) any subcontractors utilized by GDS to assist with the completion of the work; (v) a description of equipment used to complete the work; and (vi) a description of the materials used to complete the work. SOF ¶ 77.

[16]    Additionally, Factory Equipment invoices directed to GDS corroborate that soil cement was delivered to the Blaisure site on the dates identified on the work orders: November 26, 27, and 29, 2010. SOF ¶ 87. No Factory Equipment invoices exist that evidence that soil cement, or a hazardous material was delivered to the Blaisure site on November 30, 2010 or December 1, 2010. SOF ¶ 88.

he was exposed on the Blaisure site was comprised of soil cement, fly ash, or a hazardous material.

Defendants have met their initial burden for the purposes of summary judgment by showing that Plaintiff's evidence is insufficient to establish an element of Plaintiff's claim. *Celotex*, 477 U.S. at 322-23. Because Plaintiff is unable to establish the existence of an element essential to his case, that the dust cloud to which he was exposed was comprised of soil cement or fly ash, the Court is required to grant Defendants' Motion. *Id.* at 322.

### D. Defendants Cannot Be Held Liable for the Negligent Acts of Factory Equipment.

Cabot hired GDS to complete a discrete task on the Blaisure site, related to the solidification of drill cuttings contained in a reserve pit. SOF ¶ 24. GDS in turned hired an independent contractor, Factory Equipment, to deliver soil cement to the Blaisure location and unload it into the reserve pit. SOF ¶¶ 36-37. Plaintiff specifically alleged that Factory Equipment's dump trucks caused the dust cloud to occur and that Factory Equipment was "***negligent in the manner in which it dumped the substance*** and in not taking reasonable steps to contain the substance or otherwise protect persons nearby from harm or to warn those persons of its potential dangers." Doc. 42., ¶ 11 (emphasis added). To the extent Plaintiff is claiming that Defendants are liable for the negligence of Factory Equipment, his argument misses the mark.

"The general rule is that a party that hires a general contractor is exempt from liability for injuries sustained by the contractor's employees." *Warnick*, 516 F. Supp. 2d at 467; *Hader v. Coplay Cement Mfg. Co.*, 189 A.2d 271, 277 (Pa. 1963) ("Ordinarily one who engages an independent contractor is not responsible for the acts of such independent contractor or his employees."). Two exceptions to the general rule are (1) if the hiring party retains control over the means and

methods of the independent contractor's work, and (2) if the work performed poses a special danger or is particularly risky. *McDonald*, 2009 WL 3060413 at 4. Neither of the exceptions is applicable here.

GDS did not retain control over the means and methods of Factory Equipment's work. SOF ¶¶ 39-40. GDS hired Factory Equipment for the sole purpose of delivering soil cement to the Blaisure site and unloading it into the reserve pit. SOF ¶ 37. Factory Equipment supplied its own employees and equipment and conducted the delivery on its own. SOF ¶ 39. GDS did not control where Factory Equipment obtained the soil cement, the type of trucks it used to transport the material, or the manner in which Factory Equipment elevated the bed of the dump truck to unload the material into the reserve pit, which is the act that Plaintiff alleges created the dust cloud.[17] SOF ¶ 40. Because GDS did not retain control over the means and methods of Factory Equipment's work, the first exception does not apply. *See McDonald*, 2009 WL 3060413, at *4 ("A general right of the employer of the independent contractor to inspect progress, make recommendations, or prescribe alternations is not enough to bring the exception into play."); *Warnick*, 516 F. Supp. 2d at 472 ("[M]ere supervision over the work of a subcontractor, up to and including the right to stop a project, is not control sufficient to impose liability.").

With respect to the second exception, Factory Equipment's unloading soil cement into the reserve pit did not pose a special danger nor was it particularly risky. "Peculiar risk situations should be viewed narrowly, as any other exception

---

[17]     Black testified that, while standing with Plaintiff at the Blaisure site, he heard the Factory Equipment dump truck "rev" its motor to raise the bed with the material, and then observed the material "come whooshing out," which allegedly caused a dust cloud. SOF ¶ 56. Black testified that it had been raining and as a result, the truck beds had to be elevated to a certain degree before the material would break loose and unload. SOF ¶ 63.

to a general rule is usually viewed." *Warnick*, 516 F. Supp. 2d at 469 (quotation omitted). The Pennsylvania Supreme Court summarized the rule and noted that:

> the peculiar risk/special dangers provisions are not intended to apply to "the taking of routine precautions of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work." … [S]o long as the employer exercises reasonable care in selecting a competent contractor, liability for failing to take precautions will not attach.

*Farabaugh*, 911 A.2d at 1276-77.

In order to fit within the peculiar risk exception, a plaintiff must meet a two-prong test – foreseeability and unusual risk:

> A "peculiar risk" (or "special danger") exists when: (1) a risk is foreseeable to the employer of an independent contractor at the time the contract is executed (that is, if a reasonable person in the position of the employer would foresee the risk and recognize the need to take special measures); and (2) the risk is different from the usual and ordinary risk associated with the general type of work done (that is, the specific project or task chosen by the employer involves circumstances that are substantially out-of-the ordinary).

*Rudy*, 870 A.2d at 335 (citations omitted); *see also Warnick*, 516 F. Supp. 2d at 469 (same two-part test). Plaintiff cannot meet this two-prong test. "All construction work involves a risk of some harm; only where the work is done under unusually dangerous circumstances does it involve a special danger or peculiar risk. *Id.* at 469 (internal quotations omitted).

Setting aside the fact that Plaintiff has no evidence of the first prong of the test, the specific work that was being done by Factory Equipment, using dump trucks to unload soil cement, was normal and not substantially out-of-the ordinary and certainly not done under unusually dangerous circumstances. It is standard and accepted industry practice to store drill cuttings in reserve pits, as was done on

the Blaisure site. SOF ¶ 42. Pit abatement is understood in the industry to include the solidification of drill cuttings that are stored on location in the reserve pit. SOF ¶ 43. It is a widely-known and common practice in the industry to use portland cement to solidify the drill cuttings during the abatement process. SOF ¶ 43. Black testified that Factory Equipment's activities were easily observed, from where he and Plaintiff chose to stand, which was only about 35 to 40 feet away from where the dump trucks were unloading material. SOF ¶¶ 61-62, 66. Black observed three dump trucks and each truck made at least three or four trips, without incident. SOF ¶ 62.

Plaintiff has no evidence to establish that Factory's Equipment's work of unloading soil cement on the Blaisure site was substantially out-of-the ordinary and, therefore, the second exception does not apply. As a result, Defendants are not liable for the negligent acts of Factory Equipment.

### E. Plaintiff Failed to Present Admissible Evidence to Support a Finding of Medical Causation.

Under Pennsylvania law, in order to establish liability for negligence, Plaintiff must prove: (i) a duty or obligation recognized by law; (ii) a breach of that duty; (iii) a causal connection between the conduct alleged and the resulting injury; and (iv) actual damages. *See Lal*, 2013 U.S. Dist. LEXIS 47380, at *2. With respect to causation, under Pennsylvania law, "unequivocal medical testimony is necessary to establish the causal connection in cases where there is no obvious . . . relationship between the accident and the injury." *In re Paoli R.R. Yard PCB Litig.*, 2000 U.S. Dist. LEXIS 12993, at *2 (citations omitted) (toxic tort case where plaintiffs allegedly experienced medical issues as a result of exposure to PCBs); *Smith v. German*, 253 A.2d 107, 108-09 (Pa. 1969) (noting that such testimony has been required to prove a causal connection between a heart attack and heavy exertion, between a paralytic stroke and being struck by a swinging

door, and between a refracture of a bone and a doctor's failure to attend to his patient). Here, even if Plaintiff could prove that the dust cloud present on the Blaisure site on the day Plaintiff claims to have been injured was comprised of soil cement, which he cannot, there is no obvious relationship between being exposed for 2.8 seconds to a dust cloud of soil cement and the harm Plaintiff alleges to have suffered. Therefore, Plaintiff is required to present unequivocal medical testimony to establish the element of causation. In that regard, Plaintiff retained two experts: (1) Dr. Ernest Chiodo; and John Lindenschmidt, both of whom purport to opine as to medical causation, *i.e.*, that there is a 2.8 second dust cloud of soil cement caused injuries to Plaintiff. However, as set forth more fully in Defendants' Briefs in Support of Motions to Exclude the Testimony of Ernest Chiodo and Brief in Support of Motion to Exclude the Testimony of John Lindenschmidt, filed contemporaneously herewith, Plaintiff failed to present admissible medical causation evidence. Accordingly, this Court should grant Defendants' Motion.

**F.  Summary Judgment Should be Granted in Favor of Defendants Because Plaintiff Admitted on March 27, 2012, More Than a Year After the Alleged Exposure, That He Had Not Suffered Any Injury or Illness Within the Prior Five Years.**

To establish liability for negligence, Plaintiff must prove actual damages arising from the alleged exposure. *Lal*, 2013 U.S. Dist. LEXIS 47380, at *2. Here, Plaintiff admitted that he did not suffer any injury or illness during 2010, the year in which the alleged exposure occurred and, therefore, cannot establish "actual damages."

In his Amended Complaint, Plaintiff alleged that as a result of the dust cloud, which Plaintiff testified occurred on November 30, 2010 or December 1, 2010, (SOF ¶¶ 5-6) he has been permanently injured, in that he suffers "regular migraines, has difficulty breathing, has other headaches, his eyes continue to water,

he suffers from severe sinus problems and has a scar on his temple and a scar on his eyelid." Doc. 42, ¶ 1. However, Plaintiff's allegation is contradicted by the admission he made on March 27, 2012, more than a year after the alleged exposure, wherein he **signed and certified as true** that he **did not suffer any lung disease, emphysema, asthma, shortness of breath or eye disorders, and that he had not been injured or suffered any illness or injury within the past five years.** SOF ¶ 94. Because Plaintiff admitted, and certified as true, when it was to his benefit in securing a commercial driver's license, that he did not suffer any illness or injury for the five year period prior to March 27, 2012, which includes the time in which Plaintiff claims to have been injured on the Blaisure site, he cannot establish that he suffered an injury and, therefore, this Court should grant Defendants' Motion.

## V.    **CONCLUSION**

For the reasons stated above, Cabot and GDS respectfully request that the Court grant their motion for summary judgment.

Respectfully submitted,

Date: June 8, 2015

/s/ Amy L. Barrette
Amy L. Barrette, Esq. (PA 87318)
    amy.barrette@nortonrosefulbright.com
FULBRIGHT & JAWORSKI LLP
Southpointe Energy Complex
370 Southpointe Boulevard, Suite 300
Canonsburg, PA 15317
Telephone: (724) 416-0400
Facsimile: (724) 416-0404

    And

Justin Tschoepe, Esq. (TX 24079480)
    justin.tschoepe@nortonrosefulbright.com
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

Counsel for Defendants *Cabot Oil & Gas Corporation* and *GasSearch Drilling Services Corporation*