## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SCOTT MAGHAKIAN,** | : | **No. 3:12cv2346** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **CABOT OIL & GAS** | : | |
| **CORPORATION and GASSEARCH** | : | |
| **DRILLING SERVICES** | : | |
| **CORPORATION,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

This state law negligence case involves injuries Plaintiff Scott Maghakian (hereinafter "plaintiff") sustained on a natural gas drilling site leased by Cabot Oil & Gas Corporation (hereinafter "Cabot") located in Susquehanna County, Pennsylvania.  Plaintiff asserts Cabot and its wholly-owned subsidiary, Gassearch Drilling Services Corporation (hereinafter "GDS"), breached their duties to warn of or remedy dangers on the site.  Before the court for disposition is Cabot and GDS's motion for summary judgment.  For the reasons that follow, the court will grant this motion.

**Background**

In 2010, Cabot and GDS drilled for natural gas in Susquehanna County, Pennsylvania at the "Blaisure site."  (Doc. 92, Defs.' Concise

Statement of Facts (hereinafter "SOF") ¶¶ 1, 7-10).[1]  Cabot hired an independent contractor, H&P, to begin drilling operations at the Blaisure site in January 2010.  (SOF ¶ 7).  H&P ceased drilling on November 11, 2010.  (SOF ¶ 9).  The same day drilling ceased, Cabot released its possession of the Blaisure site and the drilling rig to H&P.  (Id.)

After Cabot released the drilling rig to H&P, H&P remained at the Blaisure site to supervise moving the drilling rig to another location.  (SOF ¶ 10).  Specifically, H&P hired Dalton Logistics to move the rig.[2]  (SOF ¶ 11).  Dalton Logistics in turn hired plaintiff's employer, Landstar, to transport certain rig parts.  (SOF ¶¶ 17-18).

On November 30th 2010, plaintiff and four other Landstar operators arrived at the Blaisure site.  (Doc. 106-6, Dep. of Paul Black (hereinafter "Black Dep.") at 6; Doc. 106-5, Dep. of Scott Maghakian (hereinafter "Maghakian Dep.") at 15).[3]  Upon arrival, a Dalton Logistics employee

---

[1]  In this background section, the court will cite to Cabot and GDS's statement of material facts as they are generally admitted by the plaintiff.  (See Doc. 115, Pl.'s Answer to SOF).

[2]  Cabot did not hire Dalton Logistics or have any contract or other written or oral agreement with Dalton Logistics.  (Id. ¶ 12).

[3]  All deposition citation page numbers refer to the electronic case file page number located in the upper right-hand corner of the electronically filed document.

directed plaintiff and the other Landstar operators to park their trucks around the site.  (Black Dep. at 8; Maghakian Dep. at 29-30).  Plaintiff parked his truck approximately twenty-five (25) to thirty (30) feet from a reserve pit.[4]  (Black Dep. at 8-9, 12-15; Maghakian Dep. at 15, 18).

Subsequent to plaintiff parking his truck, a Dalton Logistics employee conducted a brief safety meeting and directed plaintiff and the other Landstar drivers to stay by their trucks.  (Black Dep. at 5; Maghakian Dep. at 29-30).  After the briefing, plaintiff and the other Landstar operators socialized and noticed several dump trucks, operated by Factory Equipment,  arrive at the Blaisure site and dump Portland cement into a reserve pit located approximately twenty-five (25) to thirty (30) feet from their location.[5]  (Black Dep. at 10, 12-15; Maghakian Dep. at 18; SOF ¶¶ 36-37).

At one point, a dump truck's load became stuck in the bed of its

---

[4]  Reserve pits store drill cuttings–waste rock and small rock particles derived from the drilling process.  (SOF ¶¶ 41-42).  The reserve pit on the Blaisure site covered approximately 200 square feet on a 188,000 square foot drilling pad.  (SOF ¶ 41).

[5]  Pit abatement is the use of Portland cement to solidify drill cuttings, which have been stored in a reserve pit.  (SOF ¶ 43).  Pit abatement occurred several times at the Blaisure site, including in October and November 2010.  (SOF ¶ 44).

truck.  (Black Dep. at 15).  Paul Black, a Landstar operator, heard the dump truck driver "rev his motor up."  (Id.)  Black next noticed the material "come whooshing out" and hollered "watch out."  (Id.)  A dust cloud formed and engulfed the Landstar operators, including plaintiff.  (Black Dep. at 18).  Plaintiff immediately took off his hard hat and attempted to shake off the soot and dust.  (Maghakian Dep. at 21).

Plaintiff's exposure to the dust cloud caused him to cough, sneeze and experience a burning sensation in his nose.  (Maghakian Dep. at 11, 23-24).  Plaintiff also had difficulty breathing and his eyes began to water. (Id.)  Plaintiff did not seek immediate medical attention.  Rather, Black drove plaintiff to an emergency room in Montrose, Pennsylvania a day or two later to receive treatment.[6]  (Black Dep. at 23-25).

On November 23, 2012, plaintiff filed a single-count negligence complaint against Cabot and GDS (collectively "defendants").  (Doc. 1). After discovery, defendants moved for summary judgment.  (Doc. 91). The parties have briefed their respective positions and the matter is ripe for disposition.

---

[6] Eventually, plaintiff made it back to his home in Indiana, however, his symptoms from the dust cloud persisted, and he received treatment at a hospital in Indianapolis, Indiana for almost a month.  (Maghakian Dep. at 7-8).

**Jurisdiction**

We have jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332.  Plaintiff is a citizen of the state of Indiana.  (Doc 42, Am. Compl. ¶ 2).  Defendant Cabot Oil is a corporation and citizen of the states of Delaware and Texas and incorporated in the state of Delaware with its principal place of business in the state of Texas.  (Id. ¶ 3).  Defendant GDS is a corporation organized and existing under the laws of the state of West Virginia with its principal place of business in the state of Pennsylvania.  (Id. ¶ 5).  Additionally, the amount in controversy exceeds $75,000.  Because complete diversity of citizenship exists among the parties and the amount in controversy exceeds $75,000, the court has jurisdiction over this case.  See 28 U.S.C. § 1332 ("district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.").  As a federal court sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case.  Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Legal Standard**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id. Where the non-moving party will bear the burden of proof at trial, the party

6

moving for summary judgment may meet its burden by establishing that

the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial.

Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party

satisfies its burden, the burden shifts to the nonmoving party, who must go

beyond its pleadings, and designate specific facts by the use of affidavits,

depositions, admissions, or answers to interrogatories demonstrating that

there is a genuine issue for trial.  Id. at 324.

**Discussion**

Cabot and GDS move for summary judgment on plaintiff's

negligence claim.  In Pennsylvania, the elements necessary to plead a

negligence action are: (1) the existence of a duty or obligation requiring a

certain standard of conduct; (2) a failure to conform to that duty, or a

breach thereof; (3) a causal connection between the breach and the harm;

and (4) actual loss or damage suffered.  Atcovitz v. Gulph Mills Tennis

Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002).

Cabot and GDS provide three reasons for granting summary

judgment: (1) Cabot and GDS owed plaintiff no duty; (2) even if Cabot and

GDS owed plaintiff a duty, they did not breach this duty; and (3) plaintiff

failed to establish that the dumping of Portland cement caused his injuries. The court will first address Cabot and GDS's duty arguments, and if necessary, discuss their arguments pertaining to breach and causation.

Initially, Cabot and GDS challenge the existence of a duty, which Pennsylvania law defines as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Id. at 1222. "Whether a defendant owes a duty to a plaintiff is a question of law." In re TMI, 67 F.3d 1103, 1117 (3d Cir. 1995).

Plaintiff contends Cabot and GDS owed him a duty because: (1) Cabot and GDS possessed the Blaisure site on November 30, 2010–the day plaintiff suffered his injuries; (2) Cabot and GDS controlled Factory Equipment's dumping of the Portland cement; or (3) Factory Equipment's dumping of the Portland cement posed a "peculiar risk." We address plaintiff's arguments in turn.

**A.  Duty as possessor**

Plaintiff first contends Cabot and GDS owed him a duty because they possessed the Blaisure site on the day he suffered his injuries. Under Pennsylvania law, a party may be held liable for any injuries that

8

occur on a premises only if that party **possesses the premises in question**.  Blackman v. Fed. Realty Inv. Trust, 664 A.2d 139, 142 (Pa. Super. Ct. 1995) (emphasis added); see also Estate of Zimmerman v. SEPTA, 168 F.3d 680, 684 (3d Cir. 1999) (explaining that "[t]he duty to protect against known dangerous conditions falls upon the possessor of the land").[7]  A "possessor of land" is one who "occupies the land with the intent to control it."  Id.  A party is "considered . . . in control of [a] premises" if it "has authority to manage the land and regulate its use." Stanton v. Lackawanna Energy Ltd., 886 A.2d 667, 676 (Pa. 2005).

In the instant matter, Cabot did not possess the Blaisure site and control its use on November 30, 2010–the day plaintiff suffered his injuries.  As previously stated, Cabot hired an independent contractor, H&P, to conduct all drilling operations at the Blaisure site in January 2010. (SOF ¶ 7).  All drilling operations, however, ceased on November 11,

---

[7]  Pennsylvania law provides that for a party to be a "possessor" of land: (1) it must be in occupation of the land with the intent to control it; (2) it must have been in occupation of the land with the intent to control it if no other party has done so subsequently; or (3) it is entitled to immediate occupation if neither of the alternatives apply.  Blackman, 664 A.2d at 142 (citing RESTATEMENT (SECOND) OF TORTS § 328E).  Here, plaintiff only asserts Cabot and GDS possessed the land pursuant to the first prong, that is, they occupied the Blaisure well site with the intent to control it.

9

2010–more than two weeks prior to plaintiff suffering injuries.  (SOF ¶ 9).

On the same day drilling operations ceased, Cabot released its

possession of the Blaisure well site to H&P.  (Id.)  Thus, Cabot did not

possess the Blaisure site on November 30, 2010.

Similarly, GDS did not possess the Blaisure site on November 30,

2010.  Cabot hired GDS to perform pit abatement services on the Blaisure

site.  (SOF ¶¶ 28, 31).  GDS, in turn, hired Factory Equipment to deliver

Portland cement to the Blaisure site and unload it into the reserve pit.

(SOF ¶¶ 36-37).  Because GDS relinquished its authority to manage the

dumping of Portland cement to its independent contractor, Factory

Equipment, GDS did not possess the Blaisure site.  See Brletich v. U.S.

Steel Corp., 285 A.2d 133, 136 (Pa. 1971) (explaining that when a

possessor of land hires an independent contractor, the independent

contractor "is in possession of the necessary area occupied by the work

contemplated under the contract and his responsibility replaces that of the

owner who is, during the performance of the work by the contractor, out of

possession and without control over the work or the premises").  Ergo,

neither Cabot nor GDS owed plaintiff a duty as a possessor of land.

## B.  Duty as employer of contractor

Plaintiff also claims Cabot and GDS owed him a duty because they employed all contractors on the Blaisure site.  In the construction context, a party that hires a general or independent contractor is generally exempt from liability for injuries sustained by the general contractor's employees. Farabaugh v. Pa. Turnpike Comm'n, 911 A.2d 1264, 1273 (Pa. 2006); see also RESTATEMENT (SECOND) OF TORTS § 409 ("[T]he employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants.").

The hiring party, however, must use "reasonable care to make the premises safe or give adequate and timely warning of dangers known to him but unknown to the contractor or his employees."  Crane v. I.T.E. Circuit Breaker Co., 278 A.2d 362, 363-64 (Pa. 1971) (citations omitted).[8] Stated differently, an owner of land who delivers temporary possession of a portion of the land to an independent contractor, "owes no duty to the employees of the independent contractor with respect to an obviously

---

[8]  A possessor of land, however, "can insulate himself from liability by warning the contractor of the existence of any dangerous conditions on the premises which he knows or should know, and need not warn the contractor's employees."  Crane, 278 A.2d at 364.  Moreover, a possessor will not be held responsible for defective conditions of the land if they are the product of the independent contractor's work.  Id.

dangerous condition on that portion of the land in the possession of the contractor." <u>Hader  v. Coplay Cement Mfg. Co.</u>, 189 A.2d 271, 277 (Pa. 1963).

Pennsylvania law provides two exceptions to this rule: (1) the hiring party exercised "control over the means and methods of the contractor's work" or (2) the work being performed poses a "special danger" or is "particularly risky." <u>Farabaugh</u>, 911 A.2d at 1276.

In the instant matter, plaintiff asserts both exceptions are applicable. First, Cabot and GDS retained control over the means and methods of Factory Equipment's dumping of the Portland cement.  Second, Factory Equipment's dumping of Portland cement posed a "peculiar risk" to all individuals on the Blaisure site.  The court will address plaintiff's arguments *in seriatim*.

## 1.  The "retained control" exception

Plaintiff argues Cabot and GDS retained control over Factory Equipment's dumping of the Portland cement.  The "retained control" exception applies if the hiring party retains control over the methods and means of the contractor's work.  <u>See</u> RESTATEMENT (SECOND) OF TORTS § 414 (imposing a duty of reasonable care to a contractor's employees on

"[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work").   The contours of the exception are explained in the comment to the Restatement:

> [F]or the [retained control exception] to apply, the employer must have retained at least some degree of control over the manner in which the work is done.  It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

RESTATEMENT (SECOND) OF TORTS  § 414, cmt. c; Warnick v. Home Depot U.S.A., Inc., 516 F. Supp. 2d 459, 468-69 (E.D. Pa. 2007) (citing LaChance v. Michael Baker Corp., 869 A.2d 1054, 1058-59 (Pa. Commw. Ct. 2005)).  Here, the undisputed evidence demonstrates that Cabot and GDS did not retain control over the methods and manner pertaining to Factory Equipment dumping Portland cement into the reserve pit.

Cabot's corporate representative, Andrew Mehalko, testified that Cabot "do[es] not have any policies, guidelines, or procedures specific to the dumping of [Portland] cement for the solidification of pits."  (Doc. 106-8, Dep. of Andrew Mehalko (hereinafter Mehalko Dep.") at 2).  Mr.

Mehalko further testified that he did not think Cabot even knew "exactly how the cement was . . . being used at the site, how it was added." (Id. at 11). Moreover, plaintiff himself states that "Cabot had no safety policies, guidelines, procedures or protocols in place for the pit abatement process and the dumping of large quantities of Portland cement." (Doc. 106, Pl. Br. in Opp'n to Mot for Summ. J. at 14).

GDS also had no control over the methods and means regarding Factory Equipment's dumping of the Portland cement. (SOF ¶ 40). GDS did not control the type of trucks Factory Equipment used to deliver the cement. (Id.) No GDS employees drove the trucks onto the Blaisure site. GDS did not back the trucks up to the reserve pit. GDS did not control the manner in which Factory Equipment elevated the bed of its dump trucks to unload the Portland cement into the reserve pit. (Id.)

And, most important, GDS did not negligently dump the Portland cement into the reserve pit. Rather, plaintiff admits Factory Equipment negligently dumped the cement. Specifically, plaintiff's complaint alleges "Factory Equipment . . . caused the large cloud of hazardous substance . . . and was negligent in the manner in which it dumped the substance and in not taking reasonable steps to contain the substance or otherwise

protect persons nearby from harm . . . .  Factory Equipment was negligent and this negligence caused injury and damage to [plaintiff]."  (Doc. 42, Am. Compl. ¶ 11).  As such, the burden shifts to plaintiff, who must go beyond his pleadings, and designate specific facts within affidavits, depositions, admissions, or answers to interrogatories demonstrating that Cabot and GDS retained control over Factory Equipment.  Celotex at 324.

Plaintiff, however, fails to go beyond his pleading and designate any specific facts demonstrating that Cabot and GDS controlled the means and methods pertaining to Factory Equipment's dumping of Portland cement into the reserve pit.  This complete failure of proof on essential elements of plaintiff's claim entitles Cabot and GDS to judgment as a matter of law regarding plaintiff's "retained control" argument.  Id. at 322-23.

## 2.  The "peculiar risk" exception

Plaintiff next asserts Cabot and GDS owed him a duty because the dumping of Portland cement posed a "peculiar risk" to all individuals on the Blaisure site.  The peculiar risk exception applies where (1) "the risk is foreseeable to the owner at the time the contract is executed" and (2) "the risk is different from the usual and ordinary risk associated with the

15

general type of work done." <u>Farabaugh</u>, 911 A.2d at 1277 (quoting <u>Emery v. Leavesly McCollum</u>, 725 A.2d 807, 814 (Pa. Super. Ct. 1999)).  "[F]or the liability concepts involving contractors to retain any meaning, especially in industries such as construction where almost every job task involves the potential for injury unless ordinary care is exercised, peculiar risk situations should be viewed narrowly, as any other exception to a general rule is usually viewed." <u>Marshall v. SEPTA</u>, 587 F. Supp. 258, 264 (E.D. Pa. 1984).

In the instant matter, plaintiff asserts the peculiar risk at issue is Factory Equipment's dumping of large quantities of Portland cement. Plaintiff cites no authority for this proposition and our research has uncovered none.  Indeed, the record evidence compels a different conclusion.

Initially, the dumping of large quantities of cement to solidify drill cuttings is a usual and ordinary risk associated with pit abatement.  (SOF ¶ 42).  Further, the use of Portland cement to solidify the drill cuttings during the abatement process is a common practice in the drilling industry. (SOF ¶ 43).  Moreover, Black testified that Factory Equipment's activities were easily observed from where he and plaintiff stood–thirty-five to forty

feet away from the reserve pit.  (SOF ¶¶ 61-21, 66).  Thus, the dumping of large quantities of Portland cement posed no risk different from the usual and ordinary risk associated with pit abatement.

Moreover, plaintiff asserts that Factory Equipment's negligent dumping of the Portland cement caused the dust cloud, not the fact that large quantities of Portland cement were used.  (Doc. 42, Am. Compl. ¶ 11).  Thus, it is not the **use** of Portland cement that poses a peculiar risk.  Instead, it is **how** the Portland cement is dumped that may pose a peculiar risk.

To impose a duty on Cabot and GDS based on the "peculiar risk" exception would only serve to encourage contractors and their employees to perform their jobs negligently.  If plaintiff's argument here were to succeed, "the more negligent that an independent contractor and/or his servants are in performing an ordinary task, the more likely it is that the peculiar risk doctrine should be invoked and the employer of the contractor should be held vicariously liable."  Farabaugh, 911 A.2d at 1387.  This would indeed be poor public policy.  Therefore, the court will grant summary judgment to Cabot and GDS on this issue.

In short, Cabot and GDS owed plaintiff no duty as possessors of

17

land.  Furthermore, the undisputed evidence provides two reasons for the inapplicability of the "retained control" and "peculiar risk" exceptions to the general rule relieving the owner from any liability.  First, the evidence establishes that Cabot and GDS did not retain control over the mean and methods regarding Factory Equipment's dumping of Portland cement.  Second, Factory Equipment's negligent dumping of Portland cement is not a "peculiar risk" giving rise to a legal duty.  Because plaintiff has failed to establish that Cabot and GDS owed him a duty, plaintiff's negligence claim fails as a matter of law.  Accordingly, the court will grant Cabot and GDS's motion for summary judgment on plaintiff's negligence claim.

**Conclusion**

Based upon the above reasoning, the court will grant Cabot and GDS's motion for summary judgment.  An appropriate order follows.

**Date:   03/18/2016**                              **s/ James M. Munley**
                                                    **JUDGE JAMES M. MUNLEY**
                                                    **United States District Court**